_____

Honorable Mike K. Nakagawa
United States Bankruptcy Judge

**Entered on Docket**
**February 10, 2012**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re: | Case No.: BK-S-10-29932-MKN |
| CAREFREE WILLOWS, LLC, a Nevada limited liability company, | Chapter 11 |
| Debtor. | |
| CAREFREE WILLOWS, LLC, a Nevada limited liability company, | Adv. Proceeding No.: 11-01262-MKN |
| Plaintiff, | Date:   December 1, 2011 |
| v. | Time:   9:00 a.m. |
| AG/ICC WILLOWS LOAN OWNER, LLC, a Nevada limited liability company, | |
| Defendant. | |

**MEMORANDUM DECISION ON**
**MOTION FOR PRELIMINARY INJUNCTION[1]**

On November 29, 2011 and December 1, 2011, an evidentiary hearing was conducted

on the motion for preliminary injunction ("Injunction Motion") brought by plaintiff Carefree

Willows, LLC.  Plaintiff also is the Chapter 11 debtor in possession ("Debtor") in the underlying

_____

[1]  In this Memorandum, all references to "Section" are to the provisions of the Bankruptcy Code, 11 U.S.C. section 101 et seq.

bankruptcy reorganization proceeding.  The appearances of counsel and the parties were noted on the record.[2]  After live witness testimony and other evidence was admitted, and written and oral arguments were presented, the matter was submitted for decision.

## BACKGROUND

Debtor operates a 300-unit senior housing community situated on approximately eleven acres of real property located at 3250 S. Town Center Drive, Las Vegas, Nevada (the "Property").  Construction at the Property commenced in March 2006 and was completed by March 2008.  On or about December 16, 2005, the Debtor entered into a Construction Loan Agreement (the "Loan Agreement") with Union Bank of California, NA ("Union Bank") to obtain construction financing.  Under the Loan Agreement, Union Bank agreed to lend the Debtor $32.3 million (the "Loan") for construction.  The Loan was evidenced by a promissory note and secured by a deed of trust recorded on March 9, 2006.  The original maturity date of the Loan was March 10, 2009.  On March 10, 2009, Debtor and Union Bank executed an Amended and Restated Promissory Note, extending the maturity date of the Loan from March 10, 2009 to March 31, 2011.

The Loan was guaranteed[3] by Carefree Holdings, LP ("Carefree Holdings")[4], the Templeton Family Trust and the Ken II Trust (jointly "Templeton Trusts"), and Kenneth L. Templeton individually ("Templeton").  The Guaranty contains a provision that all of the Debtor's liabilities and commitments to Carefree Holdings are subordinated to the Loan.  The Guaranty also provides that Union Bank may request Carefree Holdings to enforce its then existing claims against

---

[2]  On November 8, 2011, a "joinder" in the Injunction Motion was filed by an "ad hoc" committee comprised of various residents of the Debtor's senior housing facility.  A declaration of one of the residents also was included.  On November 9, 2011, an additional "joinder" was filed by an entity known as Willows Account, LLC ("Willows Account").

[3]  Two different sets of documents entitled Loan and Completion Guaranty and Amendment to Loan And Completion Guaranty were executed.  One set was signed by Carefree Holdings.  The other set was signed by Templeton Family Trust, Ken II Trust, and Kenneth L. Templeton.  In this Memorandum, the court will refer to these documents as the "Guaranty".

[4]  Carefree Holdings also owns a 96.3% interest in the Debtor.

the Debtor and pay over to Union Bank the proceeds recovered.

By July 2010, Debtor was unable to service the debt and failed to negotiate with Union Bank any further extensions or modifications of the Loan.  On August 9, 2010, Union Bank recorded a Notice of Default and Election to Sell.

On September 17, 2010, Union Bank filed a complaint in the Eighth Judicial District Court for Clark County, Nevada ("State Court"), seeking the appointment of a receiver for the Property.

On October 13, 2010, Carefree Holdings assigned to PSACP Investments, LLC ("PSACP") its interest in an alleged receivable owed by the Debtor in the amount of $4,654,150.09.

On October 22, 2010, Debtor filed a voluntary Chapter 11 petition which stayed any further collection efforts by Union Bank.

On November 10, 2010, Union Bank sold its rights under the Loan to defendant AG/ICC Willows Loan Owner, LLC ("AG"), including any rights under the Guaranty.

On November 16, 2010, PSACP filed a proof of claim against the Debtor in the amount of $4,654,150.09.

On January 31, 2011, the court entered an order determining that the Debtor's Chapter 11 case involves "single asset real estate" within the meaning of Section 101(51B).

On February 25, 2011, AG filed a proposed Plan of Reorganization along with a proposed Disclosure Statement.[5]

On February 28, 2011, AG filed a proof of claim, denominated claim number 10-1, in the amount of $32,562,189.24.  The proof of claim was for the amount owed on the Loan as of October 22, 2010, i.e., the bankruptcy petition date.

---

[5]    On April 6, 2011, AG filed a first amended plan and a first amended disclosure statement. In that amended disclosure statement, AG reiterates that the amount of its claim as of the petition date is $32,562,189.24.

3

On March 2, 2011, Debtor also filed a proposed Plan of Reorganization along with a proposed Disclosure Statement.[6]

On March 3, 2011, Debtor filed a notice that the claim of PSACP had been acquired by Willows Account.  The notice stated that all future papers and notices regarding the claim shall be served on Willows Account, LLC, in care of Edward Erganian ("Erganian").  AG objected to the assignment of the claim.

On March 17, 2011, the court entered an amended stipulated order providing that the value of the Property for purposes of plan confirmation is $30 million.[7]

On March 25, 2011, Debtor filed an objection to AG's proof of claim, to which AG filed a response.

On March 25, 2011, AG commenced an action in the State Court, denominated Case No. A-11-637829-C, against the various Guarantors, including Carefree Holdings, the Templeton Trusts, and Templeton, as well as against MLPGP, L.L.C., a limited liability company ("MLPGP")[8].  Through the litigation ("Guarantor Lawsuit"), AG seeks to enforce its claims against the Guarantors for the full, unpaid amount of the Loan.

On May 24, 2011, the court entered an order overruling Debtor's objection to AG's

---

[6]  On April 8, 2011, Debtor filed a first amended plan and a first amended disclosure statement. On September 19, 2011, Debtor filed a second amended plan ("Plan").  On October 5, 2011, Debtor filed a second amended disclosure statement ("Disclosure Statement").

[7]  Debtor had filed a motion to establish the value of the Property on January 14, 2011.  AG filed opposition on February 1, 2011. The parties agreed to a value and the agreed order ("Plan Valuation Order") was entered by the court.  In its amended plan, AG bases treatment of its secured claim on the $30 million value set forth in the Plan Valuation Order.

[8]  Apparently, Templeton owns MLPGP and MLPGP is the general partner of Carefree Holdings.  Collectively, Carefree Holdings, the two Templeton Trusts, Templeton individually, and MLPGP will be referred to as "Guarantors."

proof of claim.[9]  On the same day, the court entered an order overruling AG's objection to the assignment of PSACP's claim to Willows Account.

On August 26, 2011, summary judgment in favor of AG was granted in the Guaranty Litigation on the issue of the Guarantor's liability.  The State Court continued the proceeding to determine the amount owed by the Guarantors.  Debtor maintains that the potential liability may be in excess of $33 million plus attorney's fees and interest.

On September 19, 2011, Debtor commenced the above-captioned adversary proceeding. By this action, Debtor seeks to enjoin AG from further pursuit of the Guarantor Lawsuit during the pendency of the Chapter 11 proceeding.  The relief is sought pursuant to Section 105(a) and alleges that protection of the Guarantors from a judgment in the Guarantor Lawsuit is necessary to permit the Debtor to confirm a Chapter 11 plan of reorganization.

**APPLICABLE LEGAL STANDARDS**

In this circuit, a party seeking to stay proceedings against non-debtors under Section 105(a) must meet the requirements for a preliminary injunction.  See Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.), 502 F.3d 1086, 1094 (9th Cir. 2007).  The party seeking preliminary injunctive relief must establish four elements: (1) a likelihood of success on the merits of its claim, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in the moving party's favor, and (4) that preliminary injunctive relief is in the public interest.  See Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 374 (2008); Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009); Winnemucca Indian Colony v. United States ex rel. Department of the Interior, 2011 WL 4377932 at *3 (D.Nev. Sep 16, 2011).

Where injunctive relief is sought in support of a Chapter 11 proceeding, the inquiry as to the "likelihood of success on the merits" focuses on the reorganization prospects of the debtor in

---

[9]  AG also filed a separate proof of claim, denominated claim number 11-1 on the Clerk's Register of Claims, in the amount of $31,768.76.  No objection to that proof of claim has been filed.

possession.  See In re Excel Innovations, supra, 502 F.3d at 1095-96.  The plaintiff must

demonstrate that the injunction will result in a meaningful contribution toward reorganization.  Id.

at 1097-98.  Of course, where there is no chance of reorganization, even complete dependence on a

non-debtor party intended to be protected by the requested injunction will not make that party's

contribution meaningful.  Id. at 1097.  At the very least, the plaintiff must demonstrate a reasonable

likelihood of a successful reorganization.  See In re PTI Holding Corp., 346 B.R. 820, 830-31

(Bankr.D.Nev. 2006).[10]

       The burden of persuasion rests with the party seeking preliminary injunctive relief.  See

PTI Holding Corp., supra, 346 B.R. at 827.  A "clear showing" is required to meet this burden

because a preliminary injunction is an extraordinary remedy.  See City of Angoon v. Marsh, 749

F.2d 1413, 1415 (9th Cir.1984).  The burden of proof tracks the burdens at trial, e.g., a party

asserting an affirmative defense in response to a preliminary injunction must show that the defense

is likely to prevail at trial.  See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1158 (9th Cir.

2007).  In a plan confirmation context, however, there are no "affirmative defenses" for which the

burden of proof lies with the objecting creditor.  Instead, the burden rests with the plan proponent

to demonstrate that all of the requirements for confirmation under Section 1129 have been met.

See In re Ambanc La Mesa Limited Partnership, 115 F.3d 650, 653 (9th Cir. 1997).  Thus, where a

Chapter 11 plan proponent seeks a preliminary injunction to facilitate reorganization, the

---

[10]   In PTI Holding, the court granted a preliminary injunction preventing the creditor from
pursuing the principals of the Chapter 11 debtor in a foreign proceeding.  The principals also were the
guarantors of the obligation to the creditor. Shortly after the bankruptcy petition was filed, the creditor
threatened to sue the principals in England.  Before it ever filed a proposed Chapter 11 plan, the debtor
commenced an adversary proceeding to object to the creditor's claim and also to obtain an injunction
to prevent the creditor from filing the foreign lawsuit.  346 B.R. at 822.  By its terms, the preliminary
injunction expired by the earlier of plan confirmation or a date certain.  The principals were barred
from transferring any of their assets outside of the ordinary course of business or their personal affairs
absent prior notice to or prior consent of the creditor. Any applicable statute of limitations with respect
to the creditor's threatened lawsuit against the principals also was extended. 346 B.R. at 832.  A joint
liquidating plan ultimately was confirmed which did not contain any provision enjoining any actions
against the principals.

proponent and only the proponent bears the burden of demonstrating that all of the requirements for injunctive relief have been met.

**DISCUSSION**

Debtor seeks to enjoin the Guarantor Lawsuit until such time as plan confirmation is determined. Under the Debtor's Plan, the Debtor's existing owners retain their equity interests and receive no distributions until all creditors are paid in full. AG retains its lien against the Property and its allowed secured claim would be paid in full within ten years of the effective date. Debtor's Plan also provides for the Guarantors to contribute funds to implement the Plan, including amounts sufficient to pay any unsecured deficiency claim allowed in favor of AG. The Plan also includes a provision enjoining AG from prosecuting the Guarantor Lawsuit for the term of the Plan ("Guarantor Injunction") unless the Debtor defaults.[11] Thus, Debtor's preliminary injunction request and its proposed Plan contemplate that the Guarantors would be protected from AG's collection efforts for up to ten years.[12]

AG maintains that the court lacks jurisdiction to enjoin its action against the non-debtor Guarantors. Additionally, AG argues that the requirements for a preliminary injunction have not been met even if the court has jurisdiction to issue such relief.

**A.     The Court's Jurisdiction.**

This is a core proceeding that directly involves plan confirmation. 28 U.S.C. § 157(b)(2)(L). It also is a core proceeding to the degree that an injunction against a non-debtor is akin to an extension of the automatic stay. 28 U.S.C. § 157(b)(2)(G). Compare In re Fabtech Industries, Inc., 2010 WL 6452908 at *3 (B.A.P. 9th Cir. 2010). As the court is not adjudicating a

---

[11] There is no severability provision in the Plan that would allow permissible provisions of the Plan to survive a successful challenge to other provisions. In essence, it is presented as an "all or nothing" proposal.

[12] The Guarantors Injunction does not preclude any other creditors from pursuing their claims against the Guarantors.

state law counterclaim or even rendering a final judgment on a matter of state law, the "narrow"

holding in Stern v. Marshall, __ U.S. __, 131 S.Ct. 2594, 2619-2620 (2011) does not appear to strip

a bankruptcy court of its authority to enter equitable relief or to otherwise impose an *in personam*

remedy.[13]

### B.    The Preliminary Injunction Request.

At the hearing, testimony was presented by Kevin Close ("Close"), Kenneth

Templeton ("Templeton"), and Edward McDonough ("McDonough").[14]   Numerous exhibits were

admitted into evidence.  After the hearing was concluded, simultaneous post-hearing briefs were

submitted by the parties.[15]

### 1.    Likelihood of a Successful Reorganization.

AG maintains that a successful reorganization requires that its claim be

paid in full, but that Debtor will not be able to do so.[16]  It further argues that the proposed Plan is

---

[13]   The contours of a bankruptcy court's authority after Stern v. Marshall is the subject of wide debate and further guidance in this circuit may be provided in the near future.  See Executive Benefits Insurance Agency v. Peter H. Arkison (In re Bellingham Insurance Agency, Inc.), 2011 WL 5307582 (9th Cir. Nov. 4, 2011) (Order inviting post-oral argument amicus briefs on the questions of whether Stern v. Marshall prohibits bankruptcy courts from entering a final judgment in an action to avoid a fraudulent conveyance; and if so, whether bankruptcy courts can hear the proceeding and submit a report and recommendation to the district court in lieu of entering a final judgment?).

[14]   Close testified as the chief financial officer for the Debtor.  He also serves in that capacity for most if not all of the various entities owned or controlled by Templeton.  Given Close's involvement in virtually all of his financial affairs, Templeton testified that Close is his "right hand man."  McDonough is a forensic accountant who testified on behalf of AG based on his review of the personal financial statements and records of Templeton and related entities. Those documents were produced by Templeton in discovery.

[15]   In this Memorandum, Debtor's post-hearing brief is referred to as "Debtor Brief" while AG's is referred to as "AG Brief."  The initial objection that AG filed in response to the Injunction Motion will be referred to as "AG Objection".

[16]   The existing owners of the Debtor retain their interests and the Plan itself provides for all claims to be paid in full.  As to any unsecured deficiency claim held by AG, payment in full would be required in any event to prevent AG from objecting to cramdown under Section 1129(b)(2)(B)(ii).

unconfirmable on its face because the Guarantor Injunction is invalid.

(a)    **The Prospects for AG's Payment in Full.**

As previously noted, the parties agreed that the value of the Property for purposes of plan confirmation is $30 million. Also as previously noted, AG's proof of claim 10-1 was filed in the amount of $32,562,189.24. According to the Debtor, the potential liability of the Guarantors is the full amount of the debt owed to AG, which is approximately $33,751,760, plus attorney's fees and interest. See Injunction Motion at 3:10-11. At the hearing, McDonough testified that the amount of AG's claim, including postpetition attorneys fees and interest, but net of any postpetition adequate protection payments, would be approximately $34.2 million.

The Plan provides for AG's allowed secured claim of $30 million to be paid in full no later than ten years after the effective date. During the ten-year period, AG's secured claim would bear interest at 3.75% per annum. AG would retain its lien against the Property and it would receive monthly payments based on a 30-year amortization. The monthly payments would be made from the operating revenues of the Property. To satisfy the balance owed to the allowed secured claim within the ten-year deadline, the Property will be refinanced or sold. The Plan sets no deadline by which the Debtor is to attempt to refinance or sell the Property.[17]

As to any unsecured deficiency claim owed to AG, the proposed Plan contemplates that contributions would be made by various "Contributing Entities" in amounts sufficient to pay the entire amount of the deficiency claim. The same Contributing Entities will provide all other funds required to implement the Plan, including additional funds to make the monthly payment to AG and the funds necessary to pay all other creditors (estimated to be as much as $4,846,000). In fact, the Contributing Entities under the Plan are the same as the Guarantors, i.e., Carefree Holdings, the two Templeton Trusts, Templeton individually, and MLPGP.

[17] As there is no genuine dispute that the Loan has matured, the Plan essentially extends the Loan maturity date for ten years at a reduced interest rate and with a balloon payment.

In spite of the language of the Plan Valuation Order[18], Debtor's proposed Plan currently provides that within 90 days <u>after</u> the effective date of the confirmed plan, the Debtor will propose an "Appreciated Value" of the Property for purposes of determining the amount of any deficiency claim owed to AG.  Additionally, the proposed Plan provides that a determination of the Appreciated Value will also result in a modification of the allowed amount of AG's secured claim.  If AG disputes the Debtor's proposed Appreciated Value, the Plan provides for the court to determine the value of the Property after a noticed hearing.  The court's valuation would then serve as the basis for establishing both the secured and unsecured portion, if any, of AG's claims under Section 506(a).  The Plan provides that the unsecured portion of AG's claim, if any, must be paid <u>within 15 days</u> after the Appreciated Value is determined.

As proposed, the Plan apparently contemplates two different dates at which the allowed amount of AG's claims will be determined: the amounts at plan confirmation based on the Plan Valuation Order, and the amounts determined postconfirmation based on the Appreciated Value.  The Plan contemplates that the allowed amount of AG's secured claim will be modified in accordance with the Appreciated Value and the amount of the monthly payments will be adjusted based on the same interest and amortization.[19]  As previously mentioned, the Plan also requires the Guarantors to satisfy any unsecured deficiency claim owed to AG within 15 days after a determination of the Appreciated Value.

Other than Debtor's assertion that the Property is increasing in value, no evidence has

---

[18]   The intent and purpose of the Plan Valuation Order is not entirely clear.  At the time the order was entered, Debtor's original proposed plan provided that AG's allowed claim would be determined by the value of the Property at confirmation or the balance owed on the Loan.  Because the agreed Plan Valuation Order determined the value of the Property "<u>for purposes of confirmation</u>", it appeared to resolve the allowed amount of AG's secured and unsecured claims with respect to plan confirmation issues, e.g., classification, feasibility, and cramdown.  After the Plan Valuation Order was entered, however, Debtor amended its proposed Plan to include the Appreciated Value determination that would take place after plan confirmation.

[19]   The allowed amount of the secured claim, of course, would not exceed the amount owed on the Loan.

been offered as to the value of the Property.  Neither Close nor McDonough were qualified to give an opinion as to the value of the Property.  While Close testified that the Property might be refinanced for an amount between $20 and $24 million, he did not testify whether such refinancing was based on a specific loan to value ratio.  Templeton, as the principal of the Debtor, was competent to testify as to the value of the Property, but he did not do so.  There simply is no evidentiary basis to estimate the Guarantors' maximum exposure to fund a deficiency claim under the Plan.  This is significant because if the court determines that the Guarantors would not be able to satisfy that amount, then confirmation of the Debtor's Plan is likely to be followed by liquidation of the Debtor's assets or a need for further financial reorganization, i.e., it would not be feasible under Section 1129(a)(11).

In this case, AG and the Debtor take competing positions as to the financial resources available to the Guarantors.  AG maintains that the Guarantors have between $7.5 and $10.55 million at their disposal, see AG Brief at 11:8 to 12:4, that up to $17.5 million is available through Templeton Investment Corporation (which is controlled by Templeton), id. at 12:6-21, and that Templeton personally receives $100,000 per month from an entity known as Mystic Ventures Trust.  Id. at 14:8-10.  Debtor disputes this characterization of the Guarantors' resources, offering that the liquidation value of the Guarantors' assets is far less than their market value.  See Debtor Brief at 4:28 to 6:3.  Debtor maintains that the Guarantors must retain sufficient assets to address the claims of their other creditors.  Id. at 5:3-4.[20]

AG's position regarding the funds available to the Guarantors undercuts its argument that the Plan does not provide for the full payment of its claims.  However, the Guarantors'

_____

[20]   At the hearing, the parties disputed whether the most recent financial statements provided by Templeton are complete or accurate.  A financial statement as of September 30, 2011, was admitted into evidence.  McDonough questioned certain discrepancies or differences, while Close offered certain explanations.  Templeton was unable to explain certain aspects of the statements.  Suggestions were made that Templeton has engaged in efforts to transfer his assets to shield or conceal them from his creditors, including his former spouse.  See AG Brief at 22:24 to 23:10, and 24:17-24.  Compare Debtor Brief at 6:10 to 8:25.

position that they cannot commit to contributing more than $7.5 million undercuts the Debtor's

argument that any deficiency claim will be paid in full.  If the Appreciated Value of the Property is

less than the optimistic estimates of the Debtor, then AG's deficiency claim may exceed the $7.5

million that the Guarantors are willing to commit.  As the Plan requires the deficiency claim to be

paid within 15 days after the Appreciated Value is determined, Close's testimony suggests that an

immediate liquidation of the assets will not produce appreciably more than the $7.5 million figure.

Debtor's failure to offer evidence of the Property's value, while simultaneously committing to a

deficiency payment deadline in its Plan that the Guarantors might not be able to meet, falls short of

demonstrating a likelihood of a successful reorganization.

### (b)    The Guarantors Injunction.

Although couched in terms of irreparable injury, see AG

Objection at 15:16 to 16:26 and AG Brief at 21:25 to 22:8, AG argues that the Plan cannot be

confirmed as a matter of law because it includes the post-confirmation injunction protecting the

non-debtor Guarantors.[21]  Debtor maintains that such relief is not prohibited in the Ninth Circuit.

Debtor's legal position is not helpful inasmuch as the Debtor, rather than AG, has the burden of

proof on the likelihood of a successful reorganization.  It therefore is incumbent on the Debtor to

demonstrate that a non-debtor injunction is authorized in this circuit.

As a matter of law, the court cannot confirm a reorganization plan that does not comply

with applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  Section 105(a),

which authorizes orders necessary or appropriate to carry out provisions of the Bankruptcy Code,

establishes the court's power to issue an injunction.  11 U.S.C. § 105(a).  However, Section 105(a)

---

[21]  The gist of AG's irreparable injury argument is that the absence of an injunction permitting the Guarantors to fund the proposed Plan causes no harm at all when the Plan itself cannot be confirmed as a matter of law.  Section 1129(a)(1) mandates that a plan comply with all applicable requirements of the Bankruptcy Code.  In view of this requirement, the more appropriate inquiry is whether AG has proposed a plan that can be confirmed.  If not, it has not demonstrated a likelihood of a successful reorganization.

has a limited scope and can only be exercised within the confines of the Bankruptcy Code.  See Graves v. Myrvang (In re Myrvang), 232 F.3d 1116, 1125 (9th Cir. 2000) ("Exercise of Section 105 powers must be linked to another specific Bankruptcy Code provision.").[22]  See also Joubert v. ABN AMRO Mortgage Group, Inc. (In re Joubert), 411 F.3d 452, 455 (3rd Cir. 2005); United States v. Sutton, 786 F.2d 1305, 1308, (5th Cir. 1986) (Section 105 does not authorize the bankruptcy courts to create substantive rights that are not otherwise provided under the bankruptcy code).  When a plan attempts to "affect the liability" of a nondebtor, the bankruptcy court's power under Section 105(a) is limited by Section 524(e).  See American Hardwoods, Inc v. Deutsche Credit Corp. (In re American Hardwoods, Inc.) 885 F.2d 621, 625-26 (9th Cir. 1989).  Accord Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.), 502 F.3d 1086, 1095 (9th Cir. 2007), cert. denied, 553 U.S. 1017, 128 S.Ct. 2080, 170 L.Ed.2d 816 (2008).  Section 524(e) provides in pertinent part that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).

The circuits are split on whether a plan may grant a non-debtor guarantor a permanent injunction or permanent release.  The Supreme Court has not addressed this situation.[23]  The Ninth

---

[22]  In Myrvang, the court further observed: "More recent opinions at the circuit level are equally insistent that a bankruptcy court's application of § 105(a) is limited to those situations where it is 'a means to fulfill some specific Code provision.'  In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993).  See Internal Revenue Service v. Kaplan (In re Kaplan), 104 F.3d 589, 597–98 (3d Cir. 1997) ("'[T]he fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his [or her] personal views of justice and fairness, however enlightened those views may be.'" (alterations in original) (quoting In re Chicago, Milwaukee, St. Paul and Pacific R.R., 791 F.2d 524, 528 (7th Cir. 1986)); Noonan v. Secretary of Health and Human Services (In re Ludlow Hospital Society, Inc.), 124 F.3d 22, 27 (1st Cir. 1997) ("[T]he equitable discretion conferred upon the bankruptcy court ... 'cannot be used in a manner inconsistent with the commands of the Bankruptcy Code.'" (quoting In re Plaza de Diego Shopping Center, Inc., 911 F.2d 820, 824 (1st Cir. 1990))."  232 F.3d at 1124-25.

[23]  As the Court observed in Travelers Indemnity Co. v. Bailey, 557 U.S. 137, 129 S.Ct. 2195, 2207, 174 L.Ed.2d 99 (2009): "Our holding is narrow.  We do not resolve whether a bankruptcy court, in 1986 or today, could properly enjoin claims against nondebtor insurers that are not derivative of the

and Tenth Circuits do not permit a permanent injunction or release, concluding that such devices are prohibited by Section 524(e). See Resorts International, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394 (9th Cir.), cert. denied, 517 U.S. 1243, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996); Landsing Diversified Properties-II v. First National Bank and Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.), 922 F.2d 592, 600 (10th Cir. 1990), modified on other grounds, Able v. West, 932 F.2d 898 (10th Cir. 1991).  Other circuits permit an injunction or release, but limited its applicability to rare or unusual circumstances, none of which are alleged in the present case. See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network), 416 F.3d 136, 142 (2d Cir. 2005); Gillman v. Continental Airlines (In re Continental Airlines ), 203 F.3d 203, 212-13 (3d Cir. 2000); Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 657-58 (6th Cir. 2002); Airadigm Communication, Inc. v. Federal Communication Commission (In re Airadigm Communication, Inc.), 519 F.3d 640, 655-56 (7th Cir. 2008).  As the Second Circuit Court of Appeals noted:

> [T]his is not a matter of factors and prongs.  No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique.  See Dow Corning, 280 F.3d at 658; accord Cont'l Airlines, 203 F.3d at 212-13 ("A central focus of these ... reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties. Substantial financial contributions from non-debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible."); see also, e.g., Drexel Burnham, 960 F.2d at 288-93 (approving multi-billion dollar settlement of 850 securities claims against Drexel, involving $1.3 billion payment into fund by Michael Milken and other co-liable Drexel personnel).

In re Metromedia Fiber Network, supra, 416 F.3d at 142-43.

The instant case presents neither a mass tort situation nor a permanent injunction.  The specific question presented here involves an injunction against non-debtor guarantors that will last,

---

debtor's wrongdoing. ... On direct review today, a channeling injunction of the sort issued by the Bankruptcy Court in 1986 would have to be measured against the requirements of § 524 (to begin with, at least). But owing to the posture of this litigation, we do not address the scope of an injunction authorized by that section."

at most, ten years.  This specific question has not been resolved in the Ninth Circuit.  See In re Linda Vista Cinemas, 442 B.R. 724, 741 (Bankr.D.Ariz. 2010).[24]

Several decisions discuss some aspect of the Section 524(e) question raised by the Debtor's proposed Plan.  Some of the cases include a detailed survey of the law as it existed at the time the particular decision was issued.  See In re Dow Corning Corp., supra (2002); In re Continental Airlines, supra (2000); In re Linda Vista Cinemas, supra (2010).  This court sees no benefit in duplicating all of those efforts here.  However, the court will discuss the applicable Ninth Circuit decisions that bear directly upon the issue.

In Underhill v. Royal, 769 F.2d 1426 (1985), rev'd on other grounds, Reves v. Ernst & Young, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), the Ninth Circuit considered whether a liability release contained in a Chapter 11 plan precluded an action for securities fraud against a non-debtor.  In reaching its decision that Section 524(e) prohibited the bankruptcy court from approving the proposed liability release, the Underhill court examined the legislative history of that section in connection with the 1978 Bankruptcy Reform Act,[25] as well as the Bankruptcy Act of 1898.[26]  Id.  Ultimately, the Underhill court concluded that:

---

[24] The bankruptcy court's decision in Linda Vista Cinemas was appealed to the district court for the District of Arizona.  Pursuant to 28 U.S.C. section 158(d)(2)(A), the district court certified for direct appeal to the Ninth Circuit the issue of whether "the Bankruptcy Code permits confirmation of a plan that conditionally delays a creditor from pursuing enforcement actions against contributing non-debtor guarantors so long as the debtor does not default under the terms of the confirmed plan."  See In re Linda Vista Cinemas, L.L.C., 2011 WL 1743312 at *5 (D. Ariz. May 06, 2011).  On August 9, 2011, the Ninth Circuit accepted the certification and granted permission for the appeal to go forward.

[25] "This section of the 1978 Bankruptcy Reform Act was a reenactment of Section 16 of the 1898 Act which provided that '[t]he liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt.' Act of July 1, 1898, ch. 541, § 16, 30 Stat. 550 (formerly codified at 11 U.S.C. § 34 (1976))." 769 F.2d at 1432.

[26] "[T]he Bankruptcy Act of 1898, as amended, provided that a corporation's discharge in bankruptcy 'shall not release its officers, the members of its board of directors or trustees or of other similar controlling bodies, or its stockholders or members, as such, from any liability under the laws of a State or of the United States.'  Act of June 22, 1938, ch. 575, § 4(b), 52 Stat. 845 (formerly codified at 11 U.S.C. § 22(b) (1976)).  Thus, under the old Act, stockholders or directors could remain

the bankruptcy court has no power to discharge the liabilities of a nondebtor
pursuant to the consent of creditors as part of a reorganization plan.  The
broad language of § 524(e), limiting the scope of a discharge so that it "does
not affect the liability of any other entity," encompasses this result.

769 F.2d at 1432.

Several years after <u>Underhill</u>, the Ninth Circuit had another opportunity to discuss

whether a "bankruptcy court [had] jurisdiction and power to enjoin permanently, beyond

confirmation of a reorganization plan, a creditor from enforcing a state court judgment against

nondebtors."  <u>American Hardwoods</u>, <u>supra</u>, 885 F.2d at 623.  The circuit court determined that a

bankruptcy court does not have such authority.  In reaching this conclusion, the <u>American</u>

<u>Hardwoods</u> court initially found that Section 105 is limited to those injunctions necessary or

appropriate to carry out the provisions of Title 11.  "Section 105 does not authorize relief

inconsistent with more specific law."  <u>Id.</u> at 625.  The court also looked to its earlier decision in

<u>Underhill</u> and its discussion of the legislative history of Section 524.  The court concluded that

"Section 524(e), therefore, limits the court's equitable power under section 105 to order discharge

of the liabilities of nondebtors...."  <u>Id.</u> at 626.

The court in <u>American Hardwoods</u> then noted that a discharge pursuant to Section

524(a)(2) does not void a liability <u>ab initio</u>; rather, it "constructs a bar to its recovery."  885 F.2d at

626.  Observing that a permanent injunction under Section 105 would provide the exact same

result, <u>id.</u>, the court concluded that "the specific provisions of section 524 displace the court's

equitable powers under section 105 to order the permanent relief sought by American."  <u>Id.</u>

Less than a year after <u>American Hardwoods</u> was decided, the Bankruptcy Appellate Panel for the

Ninth Circuit ("BAP") considered whether a bankruptcy court had exceeded its authority by

confirming a Chapter 11 plan that enjoined creditors of the debtor from proceeding against

co-debtors.  See <u>Seaport Automotive Warehouse, Inc v. Rohnert Park Auto Parts, Inc (In re</u>

---

liable for substantive violations despite discharge of the corporate entity.  1A J. Moore Collier on
Bankruptcy  16.14, at 1551 (14th ed. 1978)."  769 F.2d at 1432.

Rohnert Park Auto Parts, Inc.), 113 B.R. 610 (B.A.P. 9th Cir. 1990).  The BAP noted:

> Here the plan attempts to enjoin creditors of the debtor from attempting to proceed against co-debtors.  Such an effort challenges a basic tenet of the Code that Chapter 11 cases generally are for the protection of the debtor only and not to protect the debtor's principals or co-debtors.  See Matter of Pizza of Hawaii, Inc., 761 F.2d 1374, 1375 (9th Cir. 1985); In re Condel, Inc., 91 B.R. 79, 82 (9th Cir. BAP 1988).  Under such circumstances, the trial court has the duty to determine if such a plan is in accord with the Code.

113 B.R. at 614.  The confirmed plan in Rohnert Park sought to impose a five-year injunction against a certain creditor to prevent that creditor from actively pursuing co-debtors.  The BAP drew from the reasoning of the American Hardwoods and Underhill decisions.  It concluded that the co-debtor injunction provision of the plan  "affect[ed] the liability" of the co-debtors in violation of Section 524(e).  The BAP observed as follows:

> In the present case, Seaport did not agree to any release of liability of co-debtors of the debtor.  Although Section 7.05 does not release the co-debtor's from liability, the stay in 7.05 does affect the liability of the co-debtors of the debtor as to a debt owed by Rohnert to Seaport.  Seaport is prohibited from proceeding against the co-debtors until the plan is completed.  This affects the liability of the co-debtors for five years.  Seaport expressly did not waive its claims against entities other than the debtor.  Section 7.05 of the Plan does not comply with § 524(e) of the Bankruptcy Code.

113 B.R. at 616.  Thus, the BAP held that a 5-year prohibition against enforcement did not comply with Section 524(e), as it "affects the liability of entities other than the debtor."  Id. at 617.[27]

Five years after Rohnert Park, the Ninth Circuit reviewed a Chapter 11 plan that included a global release encompassing a non-debtor.  See In re Lowenschuss, supra.  The Lowenschuss court observed that :

> This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors.  American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.), 885 F.2d 621, 626 (9th Cir. 1989); Underhill v. Royal, 769 F.2d 1426,

---

[27] The creditor's lack of agreement or consent to the third-party release is important.  Neither Lowenschuss or American Hardwoods addressed consensual third-party releases and therefore do not appear to prohibit consensual third-party releases from being included in a Chapter 11 plan.  See In re Hotel Mt. Lassen, Inc., 207 B.R. 935, 941 n.7 (Bankr.E.D.Cal. 1997).

1432 (9th Cir. 1985); <u>Commercial Wholesalers, Inc. v. Investors Commercial Corp.</u>, 172 F.2d 800, 801 (9th Cir.1949); <u>see also</u> <u>Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers, Inc.)</u>, 171 B.R. 71, 77 (9th Cir. BAP 1994) (holding reorganization plans which proposed to release non-debtor guarantors violated § 524(e) and were therefore unconfirmable); <u>Seaport Automotive Warehouse, Inc. v. Rohnert Park Auto Parts, Inc. (In re Rohnert Park Auto Parts, Inc.)</u>, 113 B.R. 610, 614-617 (9th Cir. BAP 1990) (finding that a reorganization plan provision which enjoined creditors from proceeding against co-debtors violated § 524(e)); <u>In re Keller</u>, 157 B.R. 680, 686-687 (Bankr. E.D. Wash. 1993) (refusing to confirm a reorganization plan that compelled a creditor to release liens against a non-debtor's property).

67 F.3d at 1401-02.  The court reiterated that it had been asked in <u>American Hardwood</u>, but had

expressly rejected, the equitable factor approach applied by the Fourth Circuit in <u>Menard-Sanford</u>

<u>v. Mabey (In re A.H. Robins Co.)</u>, 880 F.2d 694 (4th Cir.), <u>cert</u>. <u>denied</u>, 493 U.S. 959, 110 S.Ct.

376, 107 L.Ed.2d 362 (1989).  Significantly, the <u>Lowenschuss</u> court noted a then-recent statutory

change that provided additional support for its position:

> A recent amendment to the Bankruptcy Code buttresses our conclusion that § 524(e) does not permit bankruptcy courts to release claims against non-debtors.  The Bankruptcy Reform Act of 1994 added § 524(g) to the Code.  That section provides that in asbestos cases, if a series of limited conditions are met, an injunction issued in connection with a reorganization plan may preclude litigation against third parties.  The numerous requirements of § 524(g) make it clear that this subsection constitutes a narrow rule specifically designed to apply in asbestos cases only, where there is a trust mechanism and the debtor can prove, among other things, that it is likely to be subject to future asbestos claims.  See 11 U.S.C. § 524(g)(2)(B).
>
> <u>That Congress provided explicit authority to bankruptcy courts to issue injunctions in favor of the third parties in an extremely limited class of cases reinforces the conclusion that § 524(e) denies such authority in other, non-asbestos, cases.</u>

67 F.3d at 1402 n. 6. (Emphasis added).  The <u>Lowenschuss</u> court therefore affirmed a district court

order that vacated the global release provision from the debtor's confirmed plan.

In 2009, the district court for the District of Arizona reviewed on appeal a bankruptcy

court decision[28] that permitted a temporary delay in enforcement of a particular judgment creditor's

---

[28]  <u>In re Regatta Bay, LLC.</u>, 406 B.R. 875 (Bankr. D. Ariz. 2009).

collection rights.  See In re Regatta Bay, LLC., 2009 WL 5730501 (D. Ariz. 2009).  The district

court reversed the bankruptcy court, relying upon the Ninth Circuit decisions in Lowenschuss,

American Hardwood, and Rohnert Park.[29]  The district court noted potential prejudice that the

requested injunction would visit upon the creditor:

> The Enforcement Injunction places CCV at a unique disadvantage
> vis-a-vis other creditors of Wright and Keesling.  If the Bankruptcy
> Court believed that providing Wright and Keesling with protection
> from their creditors was essential to a successful reorganization of
> Regatta Bay, all of Wright and Keesling's creditors should have been
> subject to the Enforcement Injunction.  As it currently stands, Wright
> and Keesling's other creditors remain free to engage in collection
> efforts.  Thus, those other creditors' collection efforts against Wright
> and Keesling could frustrate the Plan to the same extent CCV's
> collection efforts might do so.  But an injunction prohibiting all of
> Wright and Keesling's creditors from engaging in any collection
> efforts would be an obvious abuse of the bankruptcy process by
> protecting Wright and Keesling's assets without forcing Wright and
> Keesling to submit themselves to the bankruptcy process.

2009 WL at *2 n.1 (Emphasis added).  It therefore concluded as follows:

> The Enforcement Injunction temporarily prohibits CCV from
> engaging in collection efforts against Wright and Keesling.  Under the
> reasoning of In re Rohnert Park Auto Parts, Inc., this temporary
> prohibition "affect[s] the liability" of Wright and Keesling and is
> barred by section 524.  Regatta Bay offers no explanation how the
> temporary prohibition can be construed as not "affecting" Wright and
> Keesling's liability.  Reversal is required.

Id. at *4.

        In Linda Vista Cinemas, a different bankruptcy court in Arizona more recently

considered a proposed plan that included a 20-year injunction against a secured creditor to prevent

collection efforts against non-debtor guarantors.  Bankruptcy Judge Marlar conducted a careful

review of the various Ninth Circuit decisions addressing the issue.  While the court otherwise

believed that an injunction was appropriate, it reluctantly concluded that the current state of the law

in the Ninth Circuit prohibited the proposed plan from being confirmed with the 20-year injunction

---

        [29]  The district judge in Regatta Bay noted that the Rohnert Park decision was not binding on
the district court, but relied upon the appellate panel's reasoning and analysis for his conclusion.  2009
WL at *3  n. 4.

provision.  442 B.R. at 754.  Many of the factors for determining whether a case fits the unusual

circumstances for an injunction were present in <u>Linda Vista Cinemas</u>.  Even so, the court held that

the plan could not be confirmed with its injunction provision.[30]   As previously noted, <u>see</u> note 24,

<u>supra</u>, the issue has been certified for direct appeal to the Ninth Circuit.

        Having considered the aforementioned authorities, the court agrees with the bankruptcy

court in <u>Linda Vista Cinemas</u> that applicable Ninth Circuit authority currently prohibits a Chapter

11 plan from including a nonconsensual injunction, permanent or temporary, to prevent a creditor

from conducting collection efforts against non-debtor guarantors.  Additionally, the court agrees

with the views expressed by the district court in <u>Regatta Bay</u> that protecting non-debtor guarantors

from the collection efforts of a single creditor, but not other creditors, would be unfair.  Moreover,

this court also concludes that to afford non-debtor guarantors protection equivalent to the

automatic stay, without the creditor protections required by the bankruptcy process,[31] is neither

necessary nor appropriate in the instant case.[32]  Accordingly, the Plan cannot be confirmed under

_____

[30] "<u>The Debtor's Plan cannot be CONFIRMED</u>.  Except for the 11 U.S.C. § 524(e) issue, the Debtor satisfied the legal requirements for confirmation.  If the court did not feel bound by the Ninth Circuit's precedent, this case would appear to present the appropriate circumstances for a temporal injunction against the Guarantors and their assets, so long as the Debtor complied with the Plan.  The Debtors shall have 30 days within which to file an amended plan. All stays will remain in effect until further hearings."  442 B.R. at 754 (Emphasis added).

[31] The automatic stay is one of the fundamental protections of the bankruptcy process.  Both the debtor and the debtor's assets are protected by the automatic stay from the collection efforts of all creditors, not just selected creditors.  A party seeking the benefit of the bankruptcy protection, however, has a duty of full disclosure of both its assets and its liabilities. Questions as to the accuracy and completedness of a debtor's financial disclosures, <u>compare</u> note 20, <u>supra</u>, can result in a denial of discharge under Section 727(a)(4), or even criminal prosecution.  <u>See</u> 18 U.S.C. § 152.  A debtor that remains in possession of its assets has a fiduciary duty to all creditors and generally must obtain court approval before using or encumbering those assets.  A debtor in possession has numerous reporting requirements and may be subject to the appointment of a trustee or conversion of the case. In short, a debtor that receives the protection of the automatic stay has significant legal responsibilities that a nondebtor party simply does not bear.

[32] This is far different from the preliminary injunction issued by the court in <u>PTI Holding</u>. That injunction included significant restrictions on the guarantors' transfer of assets and no post-

current authority in this circuit to the extent it includes the Guarantors Injunction.

Because there is no severability provision in the Debtor's Plan, the court cannot ignore the Guarantors Injunction and separately consider the validity of the remaining portions.  For this additional reason, the court cannot conclude that the Debtor has met its burden of establishing a reasonable possibility of a successful reorganization.

## 2.   **Likelihood of Irreparable Injury.**[33]

AG also argues that the Debtor failed to meet its burden of proving that irreparable injury is likely to occur in absence of an injunction.  First, it maintains that even without an injunction, the Debtor could fully fund its Plan through refinancing the Property and obtaining additional funds from the Guarantors or Templeton Investment Corporation.  See AG Brief at 9:15-19.  Second, it argues that the Guarantor Litigation has little impact on the availability of Templeton to assist in the Debtor's reorganization efforts.  Id. at 16:10  to 20:28.

### (a)   **Guarantors' Financial Abilities.**

---

confirmation injunction was contemplated.  See note 10, supra.

[33]  Injunctive relief is an equitable remedy that traditionally requires a demonstration that the plaintiff's remedy at law is inadequate.  In certain situations where the court finds an award of damages to be an inadequate legal remedy the conclusion usually is characterized as a finding of irreparable injury.  In patent and trademark infringement, adequacy of the legal remedy and the presence of irreparable injury apparently are regarded as separate concepts at least where permanent injunctive relief is sought.  See eBay Inc. v. Mercexchange, L.L.C., 547 U.S. 388 (2006) (remand to trial court to require plaintiff who prevailed in patent infringement case to satisfy four-factor test for permanent injunction: (1) that it suffered irreparable injury, (2) that legal remedies such as damages are inadequate to compensate for the injury, (3) the balance of hardships warrants a permanent injunction, and (4) the public interest would not be disserved by the injunction).  Where a plaintiff seeks to enjoin a defendant from pursuing relief in another forum, some court's look to whether the plaintiff's interests can be protected in the other proceeding.  See, e.g., Norcisa v. Board of Selectmen, 368 Mass.161, 330 N.E.2d 830 (Mass. 1975) (Injunction to prevent criminal prosecution denied where, inter alia, available defenses to criminal complaint amounted to adequate remedy at law).  In the present case, the parties have advised the court that the summary judgment granted by the State Court on the issue of liability is the subject of an interlocutory appeal to the Nevada Supreme Court. The court has no current information as to the status of that appeal and whether its outcome would delay entry of judgment as to the Guarantors and thereby make the requested injunction unnecessary.

The parties' respective positions as to the resources available to the Guarantors and related entities was previously discussed. Debtor maintains that if the court denies the injunction, AG would proceed to judgment in the Guaranty Litigation and would attempt to execute on the Guarantors' assets. If that occurs, Debtor asserts that the Guarantors would not be able to contribute to the Plan and likely would be required to seek bankruptcy protection themselves. Id. at 6:5-7.

Close and Templeton testified that the Guarantors' obligation to AG is but one of a number of financial problems confronting them. Close testified that Templeton received a letter from the Federal Deposit Insurance Corporation ("FDIC") referencing a potential civil money damage claim in the amount of $18 million. He also testified that the Guarantors have an additional $60 million in loans outstanding. Close testified that he is optimistic that the claims could be resolved for far less than the amounts owed, but that the Guarantors need cash available to negotiate. Because of the other obligations, including Templeton's divorce proceedings, both Close and Templeton testified that the Guarantors would not be willing to contribute more than $7.5 million to the Plan. At the hearing, Debtor indicated that without the protection of an injunction, the Guarantors are not willing to set aside the funds required to implement the Plan.[34]

Because the Debtor's equity holders and the Guarantors are one and the same, their unified position is the equivalent of taking each other hostage. In other words, the Debtor will seek the Guarantors Injunction only if the Guarantors commit sufficient cash to fund any deficiency to AG, and the Guarantors will commit to fund the Plan only if they obtain protection from AG

---

[34] Debtor maintains that the Plan was filed in good faith. See Debtor Brief at 12:11 to 13:23. It also questions whether the Guarantors could be compelled to contribute all of their available funds to fund the Plan. Id. at 12:26 to 13:4 ("[U]nder what authority should the Guarantors be required to contribute to the Debtor every penny that they can possibly spare to fund the Debtor's Plan?...[U]nder what authority should the Debtor be required to ask the Guarantors for as much as they can possibly muster to fund the Debtor's Plan?"). The argument misses the point: the Guarantors are separately liable to AG and would have to seek bankruptcy or injunctive relief themselves if they wanted to forestall AG's collection efforts. It is their circumstances that would "compel" the Guarantors to make choices concerning their funds.

without having to file for bankruptcy themselves.  In such circumstances, characterizing the consequences to either party as irreparable is a fiction.  Instead, the consequences reflect difficult, but conscious choices that are created and made by the same person.  Thus, irrespective of the amount of funds actually available to the Debtor through the Guarantors, or the willingness of the Guarantors to commit their funds, irreparable injury is not present.

### (b)    The Guarantors' Time Commitments.

Templeton testified that he visits the Property three to five times each week for approximately 20 to 50 hours, and visits with senior residents at the facility.  He testified that the Guaranty Litigation diverts his attention from the Debtor's reorganization efforts but he did not know how much time actually is involved  AG argues, however, and the court agrees, that the Guaranty Litigation has had little impact on the Debtor.

Templeton testified that day-to-day management of the Property is performed by Ken Templeton Realty and Investments, Inc.("KTRI"), which has ten employees as well as numerous resident volunteers.  He testified that he makes certain advertising decisions and spends time reviewing reports, in addition to visiting with residents.  Templeton's hands-on approach and popularity perhaps explains why an ad hoc residents committee was formed to support the Debtor's Injunction Motion.  It does not suggest, however, that the Guaranty Litigation in fact is having a significant impact on the hours Templeton is available to the Debtor's reorganization effort.  Moreover, Close testified that he has litigation management responsibilities rather than Templeton.

Even if the Guaranty Litigation required meaningful time from Templeton, the evidence suggests that the financial impact on the Debtor has been minimal.  Templeton testified that KTRI manages a larger senior apartment facility in Sacramento, California, operating under the name Carefree Natomas.  Even though Templeton is not present at the Carefree Natomas facility, he testified that the occupancy and lease rates are comparable to the Debtor's facility.  While the court does not doubt that Templeton's presence as the "owner" fosters better relationships with the Debtor's residents, the evidence does not establish that his involvement in the Guaranty Litigation

will cause irreparable injury.

Debtor has not met its burden of demonstrating a likelihood of irreparable injury if the preliminary injunction is not entered.

### 3.    Balance of Hardships.

Debtor maintains that its Plan, as well as the competing plan offered by AG, will result in payment in full to AG.  Because AG gets paid in any event, Debtor argues that there is little hardship imposed from having AG wait a short period of time to get to plan confirmation.  See Injunction Motion at 11:10-14.  See also Debtor Brief at 13:25 to 14:27.  AG maintains that an injunction solely against AG, while all other creditors are free to pursue their claims against the Guarantors, places it at a disadvantage and jeopardizes its ability to completely enforce its claims.  See AG Objection at 17:8-12; AG Brief at 22:14-17.[35]

There is intuitive appeal to the Debtor's position: a brief injunction until plan confirmation seemingly poses little risk to AG, especially if monthly adequate protection payments are made and the Guarantors deposit the necessary contributions in advance of the confirmation hearing.  The magnitude of the risk, however, can change at any time so long as AG is the only one of the Guarantors' creditors that is enjoined.  This is illustrated by the special protections that the Debtor seeks for the funds that would be deposited in advance of plan confirmation.

The Guarantors apparently are willing to deposit up to $6,683,000 into an escrow account within ten days following issuance of a preliminary injunction.  See Debtor Brief at 18:2-3 and 17:1-3.  Their concern is that if the Debtor's Plan is not confirmed, the funds would be returned to Templeton Investments Corporation "without interference from AG."  Id. at 15:21-23.  While the court might be able to restrict AG from executing against the funds on deposit, the court

---

[35]  It does not appear that AG is raising confirmability of the Plan as a balance of hardships issue, i.e., that because the Plan cannot be confirmed, there is no hardship created by continued prosecution of the Guaranty Litigation.

cannot restrict the Guarantors' other creditors from pursuing other assets.[36]  In those circumstances, AG would not have access the funds deposited by the Guarantors nor could it reach the other assets of the Guarantors.  In the meantime, unless there was a further injunction precluding the Guarantors from transferring their other assets, compare PTI Holding, supra, AG's ability to realize on the Guaranty may evaporate.

Under these circumstances, the court cannot conclude that the balance of hardships weighs in Debtor's favor.

### 4.    The Public Interest.

Debtor maintains that the public interest is served by allowing debtors to reorganize through Chapter 11.  Confirmation of its Plan will permit all creditors to be paid in full, all employees to be retained, and the principals' equity to be preserved.  It argues that the Debtor, through the personal attention of Templeton, provides extraordinary care for its senior citizen residents.  See Injunction Motion at 11:23 to12:2; Debtor Brief at 17:16 to 18:2.  Therefore, it contends that a preliminary injunction will facilitate a reorganization that is in the public interest.

AG's counter-argument is predictable: facilitating a reorganization plan that cannot be confirmed is not in the public interest.  See AG Objection at 17:16-20.  It maintains that jobs will not be lost as the senior housing complex will continue to operate regardless of who owns it.  Moreover, it contends that the Debtor and the Guarantors have engaged in a multitude of questionable and even fraudulent inter-company and insider transfers designed to avoid personal liability.  Id. at 17:24 to 17:11.  One example involves the claim of PSACP that was transferred to Willows Account.

Apparently, PSACP is an entity owned or controlled by Phillip S. Auerbach ("Auerbach"), former counsel to the Debtor.  Auerbach is the trustee of the PSASP Trust, UAD 10/28/94, which is or was a limited partner of Carefree Holdings.  Debtor sought to employ

---

[36]  It does not appear that the Guarantors' other creditors are also creditors of the Debtor.

Auerbach's law firm as special counsel in the case, but the court denied the application.  As previously noted, Carefree Holdings assigned to PSACP its claim against the Debtor in the amount of $4,654,150.09.   Templeton acknowledged at the preliminary injunction hearing that Carefree Holdings sold its interest in the claim to PSACP for $5,000 and that the claim subsequently was assigned to Willows Account for $10,000.[37]

On the first day of the preliminary injunction hearing, Templeton was specifically examined concerning the PSACP/Willows Account transaction.  Under AG's cross-examination, Templeton testified that Erganian is one of the principals of Willows Account, that Templeton played basketball with Erganian for many years, and that Erganian is a tenant in one of Templeton's buildings.  Templeton testified that except for the landlord-tenant relationship, Erganian has no other direct or indirect relationships with Templeton or any of Templeton's entities.

On the second day of the hearing, Templeton was questioned again by Debtor's counsel concerning the PSACP/Willows Account transaction.  This time, Templeton testified that he helped Auerbach locate Erganian as a purchaser of the PSACP claim and put him in touch with Close to complete the transaction.  Additionally, Templeton testified that in 2008 or 2009, he sold a $500,000 promissory note to Erganian in exchange for $1,000.  Templeton also testified that in 2008, 2009 or 2010, he sold a $2.7 million promissory note to Erganian.  On further examination by AG, Templeton testified that Erganian was a past customer of a bank for which Templeton acted as the chairman.  According to Templeton, Erganian obtained many loans from that bank before it was taken over by the FDIC.  In addition to the bank loans, Templeton testified that he personally loaned up to $800,000 to Erganian five years ago.

It is difficult at best to reconcile Templeton's completely contradictory testimony concerning his financial relationship with Erganian.  This perhaps explains why the Debtor makes

---

[37]  As previously noted at 5, <u>supra</u>, the court overruled AG's objection to the transfer of the claim to Willows Account.

no effort whatsoever to explain it in its post-hearing brief.  It also is significant because of Erganian's apparent role as a principal of Willows Account and the role played by the Willows Account claim in this Chapter 11 proceeding.

Other than AG, the Willows Account claim is the largest unsecured claim against the Debtor.  Debtor's Plan separates creditors and interest holders into five separate classes, with AG's unsecured deficiency claim in Class 2 and general unsecured claims in Class 4.  General unsecured creditors will be paid 95% of their allowed claims, without interest, on the effective date of the Plan.  Unsecured creditors can elect to forego immediate payment, and can obtain payment in full, with interest, but only from the proceeds of an eventual sale or refinance of the Property.  Absent any other applicable class, the Willows Account claim would be included in Class 4.

According to the Debtor's second amended Disclosure Statement, the Guarantors will deposit $4,846,000 into escrow for the potential priority and general unsecured creditors, as well as other operational funds and the amount of AG's deficiency claim.  Inasmuch as the Willows Account claim is in the amount of $4,654,150.09, it clearly would control Class 4 acceptance under Section 1126(c).[38]  More importantly, Willows Account could drastically reduce the amount of the Guarantors' contribution by electing to seek payment in full, plus interest, at the time of some future sale or refinance of the Property.  Inasmuch as Willows Account acquired the $4,654,150.09 claim for $10,000, the potential for manipulation is clear even though Templeton's relationship with Erganian is not.

While a successful reorganization of a viable business serves the public interest, the means by which the reorganization is achieved also must be consistent with the public interest. Templeton's evasive and contradictory testimony concerning Erganian, coupled with the spectre of

---

[38]  At this juncture, AG has not raised an objection under Barakat v. Life Insurance Company of Virginia (In re Barakat), 99 F.3d 1520 (9th Cir. 1996) with respect to Debtor's attempt to classify AG's unsecured deficiency claim separately from the general unsecured creditors.  Debtor's Plan at Section 4.2(D) contemplates that such classification might not be allowed. If the AG unsecured deficiency claim is included with Willows Account claim, then either could prevent class acceptance.

manipulation that is created, casts significant doubt as to his credibility as a whole.  Under these circumstances, Debtor has failed to meet its burden demonstrating that the public interest would be served by entering a preliminary injunction to protect the Guarantors.

**CONCLUSION**

Based on the foregoing, the court concludes that the Debtor has failed to meets its burden of persuasion and burden of proof with respect to the elements required for a preliminary injunction.  A separate order has been entered concurrently with this memorandum decision.

Copies noticed through ECF to:

MICHAEL R. BROOKS jsallade@brooksbauer.com

DAWN M. CICA dcica@lrlaw.com,
    jvienneau@lrlaw.com;cjordan@lrlaw.com;mschoeni@lrlaw.com;mburns@lrlaw.com

ROBERT R. KINAS rkinas@swlaw.com,
    jmath@swlaw.com;mfull@swlaw.com;cdossier@swlaw.com;nbaig@swlaw.com;bgriffith
    @swlaw.com;nunzueta@swlaw.com;docket_las@swlaw.com

ALI M.M. MOJDEHI Ali.Mojdehi@bakermckenzie.com,
    Terri.Mayo@bakermckenzie.com;Janet.Gertz@Bakermckenzie.com;Brian.Byun@bakermc
    kenzie.com;Allison.Rego@bakermckenzie.com

ALAN R SMITH mail@asmithlaw.com

RYAN J. WORKS rworks@mcdonaldcarano.com, kbarrett@mcdonaldcarano.com

and sent by BNC to:

All parties on BNC mailing list

# # #